This is Boggs v. Newman-Alton for the appellate, Mr. Wasser, to the appellee, Mr. O'Hara, if you may proceed. I please the court, counsel. Good afternoon, members. Stanley Wasser for defendant, appellate, Newman-Alton, Inc. We're asking the court to reverse the May 23, 2013 order and July 17, 2013 order of the Sacramento County Trial Court. Just a very brief fact comment. There are two projects here. Supportive Living Facility, which everybody refers to, and I will also as SLF, keeps it shorter. The other is the Independent Living Facility, ILF. We put forth four arguments to the court. I'm going to present my arguments to you in the order that I put them in the brief. With the SLF project, the court, the trial court said, once the federal funds were removed, the only funds that were there were IDA funds. And so from that, the trial court said, Illinois Prevailing Wage Act. But uncontroverted evidence of record I submit was that the only funding for this project that fell into a public rubric was this federal low-income housing tax credit. This wasn't a case of the trial court having to choose between plaintiff's evidence and defendant's evidence. All the evidence was put forward by the plaintiff. There was not a credibility issue. No one challenged the credibility of Mr. Schneider, the city employee who was called. And in fact, it was pretty clear that he had the foundation established for his testimony. He was asked. It's his job to know this. He looked at the application. It was low-income housing tax credits. And then I even asked him, anything else? And he goes, nothing else to the best of his knowledge, which I suggest is the standard. We put forth in our brief all the authority that shows that federal low-income housing tax credits do not fall into the trigger that triggers the Illinois Prevailing Wage Act. I don't believe there's anything to the contrary. If you look at the Illinois Prevailing Wage Act in Section 2, there are statutes which are not involved, separate funding statutes like industrial bonds. But the catch-all phrase in Section 2 is bonds, grants, loans, and other funds made available to a buyer through the state or the political subdivisions. In essence, the common thread of all this is that when a public body transfers money to the entity, then it triggers the act. And in this case, that's not what happened. We pointed out to you this Court's decision in Tony v. Bauer, which I believe is page 31 of our brief. This Court recognized the difference between public funds and tax credits. Tax credits are not the equivalent of money. And we pointed out to you that this Court in the Rainbow Apartments case, which I believe is page 32 of the brief, even noted that there's no value to these credits standing alone. And I believe that these federal low-income tax credits are just like the TIF funding economic development centers that this Court addressed in the Town of Normal case. And just one quick quote from that decision. This Court said at page 597 of the decision, the purpose of the act, meaning the Prevailing Wage Act, is to ensure laborers on public projects are paid the prevailing wage, not to interfere with economic development by private companies. And we've pointed out fully in a lot of detail why the low-income tax credits are, in fact, these same kind of economic centers. Let me turn to the ILF project. The ILF project, the Independent Living Facility project, is a little more complicated, so bear with me. The trial court said, my decision is as follows, that these CDBG, Community Development Block Grant federal monies, were granted exclusively for this utility work to reimburse the cost. This utility work performed by city employees who would not have to receive federal Davis-Bacon. And the trial court said, because it was exclusively for this purpose, then the whole project is not subject to CDBG. So if you think of a large construction project, let's say the building and everything, and over here is the utility, the trial court was saying, look, because it was exclusively just for this part of it, then it doesn't have any variance. Not construction, finance, in part, which is the statutory phrase. Now the trial court cited legal authority for this, but let me show you why, as we did in the brief. I'd like to emphasize to you why the trial court erred, and why the trial court's logic, I believe, undermines even the purpose of the act. The construct, I think, is very straightforward. The Davis-Bacon Act applies to construction performed at the site of the work. And that's a little V, little double I, V-I-I, when we put out all of our statutes, 3142C1. That's the phrase, construction performed at the site of the work. Construction, as we cite, is defined by the federal labor regs and authorities and guidance, that includes all work, that's the words, all work at the site, and the guidance shows it also includes utility work. So construction performed at the site of the work. All work, including utility work. Site of the work, that's where the marble rules. Site of the work is defined specifically by the federal regulations, that's the 29 CFR 5.2L, that's a little I, little X, that's where the statute shows, and the implicating authorities that show what that means. What does it say? It says site of the work is the location where the work called for in the construction contract will remain in any other dedicated sites. And the uncontroverted evidence on this record is that Newman Alton had a contract, and that contract specifically called for the utility work, albeit it's a dedicated subcontractor, but it was part of the construction, it was integral to this project, provided water to a residential project, so you can get presumably potable water and a fire system and the fire hydrants. And most importantly, the evidence was uncontroverted that this work was situated on the site of the work. A small, there was a big, this is a supplement of the exhibit because it was left out. First we're going to get the plan sheet, defendants five, and Mr. Alton testified that here's the street, the city took it over across to the sidewalk, across the little grass strips, and right onto the 300 feet straight across the actual defined public site. So clearly this utility work, part of the construction work, on the site of the work. In fact, there's testimony that Newman Alton backfilled that trench. And then the uncontroverted testimony was that Newman Alton paid for the labor, they paid it, it was part of their contract, they paid the city, they billed the owner, and the owner paid them. The owner had some money, and what was the money? The money was the CDBG funds. It financed, in part, the construction work, meaning the large, not just focusing on the utility work. And the logic of the trial court's decision, which I believe is contrary to the clear public purpose, is consider the following. What if the only public funds for this project had been CDBG, so we didn't have any other, either any other money. And if the focus for the interpretation is to look only at the very part of the work, the specific work, that the CDBG funds go and say, well, it's only that work, that's the only thing that you look at, you don't define the construction, the term construction is the everything else. So let's say it was landscaping work. So the landscapers would get prevailing wage, and everybody else working on the project would get something other than prevailing wage, if the logic is that you don't extend the CDBG funding to the whole project. But in fact, the statutory scheme, the definitions, everything is to say it's the full project. There's nothing in any federal statute, authority that we found, it didn't cite any, I don't think it's been cited, that says that that exception exempts, just because it's on force account work, or this one specific utility work, that that all of a sudden means that you don't look to the entire project. Now the trial court did have in front of it, there was controversy about it as evidence from the record, there was this Volkman letter, Roxanne Volkman, a HUD employee. And there was this letter, and possibly, let's say the trial court may have looked at that. But if you look at the Volkman letter, which is Plaintiff's Exhibit 8, Volkman's letter doesn't even say what the trial court said, it doesn't support it. Because Volkman said, it's triggered by sight of the work. Now Volkman, we argue, was acting under an erroneous assumption, because she had been told that the utility work was not on, it just stayed over here, it was off the site. But her letter nowhere says that it has anything to do with a force account. And in fact, her force account language is in a standalone paragraph, separate and apart from her determination paragraph. So if the trial court was relying on that, I think it's an error as a matter of law. I don't think she was correct. But even Volkman doesn't support that. In addition, I would say that the trial court who says, and says, oh, it's exclusively granted pursuant to the sub-recipient agreement, if you look at that sub-recipient agreement, I would suggest that the trial court decision cannot be even reconciled with that. Because Section 19, and that's Plaintiff's Exhibit 7, the sub-recipient agreement, Section 19 inherits the language of the Section 110A of the Housing Community Development Act, that's the CBBG Act that says when Davis-Bacon applies. And it says, in Parrott's language, all workers on construction, work finance, and home and apartment assistance received under this grant shall be paid wages in accordance with Davis-Bacon Act. Why would that assurance be necessary if it was exclusively only for this force account work? And that was somehow the only limit of it. So I would suggest that in this case the trial court just erred as a matter of law in its decision on how it interpreted the law. Let me turn to the pre-judgment interest. Now, the pre-judgment interest was awarded on the dollars that the trial court awarded for the ILF project wing, so it has nothing to do with the SLF project wing. Pre-judgment interest, and the trial court said it was statutory 5%. So it's a statutory element, because this is an action at law. There is no equitable right to interest. That statute, the Interest Act, 815 ILCS 205-2, requires the trial court to make a finding. It says the court has to find that the payment was withheld by, quote, unreasonable and vexatious to look at, both unreasonable and vexatious. So while it's a discretionary decision by the trial court, the trial court still must exercise its discretion in accordance with the law. And in this case it had to make findings. It made no findings. Now, we've set out in our brief why we've said there's no evidence of record looking at the totality of the circumstances, that the trial court could reasonably conclude that there was unreasonable and vexatious delay. Newman Alton had a right to litigate an honest dispute without penalty of being subjected to this interest award. The cases are uniform on that. It also suggests that the failure of the trial court to make a finding or suggest why it was doing it is another indication of it being against an abuse of discretion. Clearly, on this record, it would be an error of judgment to award prejudgment interest assuming you get to that issue. Obviously, if you find that the trial court erred and said that the Illinois Prevailing Wage Act doesn't apply because of the CDBG funds, you don't get to the interest argument. But should you affirm the trial court on that, there's no basis for the interest to be awarded. Now, the attorney's fees, that issue really could be implicated on both the SLF and the ILF because if you look at the July 19, 2013 order of the trial court, which is in Appendix A-4 and A-5, because it was an order and then it was a back entry, it refers to awarding fees under Exhibit A, which was the original petition of Mr. Boggs' counsel, which was the SLF and Exhibit B, which is the ILF. So it applied to both. Our argument, we're not arguing with the dollar amount. We're just saying that any award of fees in this case as a matter of policy on the record of this case is abuse of discretion. What the trial court stated was the trial court order says the award was quote-unquote appropriate. And in another sentence toward the end it says it was reasonable and necessary for the litigation, although no explanation. We would submit to you that where the parties engage in good faith litigation and the trial is justified to award discretionary fees in the face of a bona fide legal dispute of the kind that was here is an abuse of discretion. Certainly an employer, for example, shouldn't have to choose between trying to believe that there's a justifiable position. This isn't somebody who just walked away, never made a payroll or whatever. But shouldn't have to make that choice. And this is not a prevailing party statute. So the presumption in attorney's fees and jurisprudence is the American rule. The presumption is that each party bears their own fees. Section 11, I would submit, creates it like other statutes, but it creates a discretionary exception to the rule. And because it creates a discretionary exception, it should be looked at strictly and narrowly. Because for the exercise, it needs to be more as a basis for awarding the fees. And as the trial court appears to have done to presume otherwise, I would suggest it undermines the American rule. There's nothing about the relative merits of the parties in this case that would warrant a fee award. I would suggest there's nothing in the record that indicated that Newman Alton's position was without foundation or frivolous. Arguing the applicability of law. The trial court explained its reasoning for awarding attorney fees, when to go wrong in doing so. In the July 13th order? Yes. Yeah, I acknowledge up front that the court said the award is appropriate in this case, and at the very end of the order they said reasonable and necessary for litigation. Then it explained how it calculated. But we're not challenging the calculation. We're saying no fees should be awarded as a matter of policy. The discretion was exercised wrongly to award any fees. We're not coming to court and saying they shouldn't get $100 until they get $75. We're not arguing that. The trial court did decide how it came up with a specific number. But we're saying that the decision up front to say I'm going to award fees. Counsel, here's the problem. As I had occasion earlier in oral arguments pointed out, the panel before you deals with some experienced appellate judges. But before being on the appellate court, we have cumulatively over 40 years' experience as trial judges. That means we take seriously the idea of deference to trial judges on discretionary calls, especially in a situation like this where the judge had an opportunity to see and hear and evaluate all these disparate witnesses and arguments, all of which you presented to the trial court. You seem to be arguing to us as if we were the trial judges and free agents to say, hey, you got it wrong. You should set it aside. On the attorney's fees or on? Well, pretty much findings and conclusions and attorney fees and the whole thing. Let me find a way to respond to that. Just doing the order that's in my head. The interest argument is wrong as a matter of law. In other words, we're just saying that it's wrong. There was a required finding, no finding. The SLF one, we've cited it in our briefing. We acknowledge the standard of review. But we also pointed out that direction has been given both from the Illinois Supreme Court. Otherwise, there still has to be a demonstration of some conscientious reasoning by the trial court, and it shouldn't be rubber stamped. I know it's a horrible phrase. I acknowledge the full breadth of experience. I know the experience that this bench has. But still, there is a basis for reviewing this. And we're asking, certainly on the attorney's fee one, that it's a difficult call. I grant that. That, in fact, when you have this kind of record, that it would be an abuse of discretion to award any kind of attorney's fees on this case. There has to be something to warrant it. And there's nothing, I would suggest, in this record by any of the measurements that would be applied. On the SLF one, there are decisions that come up many, many times. And, in fact, there are decisions that even lead to the principle that was cited in our reply brief, which is trial courts are not allowed to ignore uncontroverted evidence. In this case, it would be fake in the SLF. They did ignore it. The trial court did ignore uncontroverted evidence. I don't think how you can... What was the uncontroverted evidence? That was that the only, the plaintiff's evidence was Mr. Schneider. The testimony was, you know, is it part of your job to know what the financing was for the SLF project? Yes, it was. What it wasn't, I'm paraphrasing. It's like 208, 212, 213, 219. But what he said was, he said it was federal, it was low-income housing tax credits. He was asked, you know, how did you know that? He said, because I looked at the application. Then I asked him, is that what you're saying? He goes, yes. I said, was there any other funding? He says, to my knowledge, none. And it was challenged that his, to my knowledge, was equivocal, but I would suggest that that's the basis that all witnesses testify to. So here's the trial court with plaintiff's own evidence, not defense evidence, plaintiff's own evidence, that the funding for the SLF project were low-income housing tax credits, which we showed don't trigger. Why do you argue that the trial court ignored it? Because the trial court said, in its decision, once the home funds, which were a separate federal program, there was funding coming in right at the very end, which would have made the whole project subject to federally mistaken. Once the trial court said, once those home funds were removed, the only other funding was IDA funds, and therefore the prevailing way to apply. I am saying that the IDA funds, which everybody sort of put a moniker on, but the only testimony about what the actual funding was, was low-income housing tax credits. Plaintiff put it on. It was uncontroverted. The gentleman's job was to know what it was. He said he looked at the application. This is what it was, and there was nothing else. How can the trial court have then concluded it's some kind of IDA money that triggered Illinois prevailing wage if, as we argue, it's uncontroverted, that the specific and only real testimony here is that the only person who identified exactly what the funding was was Plaintiff. We'll have additional time on rebuttal. Okay, thank you. Mr. O'Hara. May it please the court, counsel, I heard counsel for Newman Alton use the phrase totality of circumstances, and I think that's an important thing for this court to consider because I think there's an overarching inquiry that has to be made in this case, and that is whose responsibility is it to determine the appropriate wage  And I think the answer is the contractor. Indubitably, it's the contractor. And the question that has to be asked here is did the contractor here do that? There's a statutory requirement to look at statutes to determine whether state prevailing wages are appropriate. It's vacant or a collective bargaining agreement, but it's the determination of the initial determination and responsibility of the contractor. In this case, curiously, the defense for the IOF project, for example, is I would note the coincidence here of two projects back-to-back and have wage controversies, which I think says volumes about what we're dealing with here. But just take the IOF project. The source of the defense here is that, oh, this isn't a state prevailing wage project. This is a Davis-Bacon project. But that's derived from this sub-recipient agreement that's talked about because that's the source of the CDBG funds. And when the principal office, one of the principal offices, the 50 percent owner, that's the comptroller of Newman-Alton, was asked about the sub-recipient agreement at trial, he said he'd never seen it before. And then it indicates in the brief that somehow the sub-recipient agreement doesn't exempt the project from Davis-Bacon. Indeed, the brief of Newman-Alton says that, I quote, quote, unquote, reporting requirements, not that the entire ILF project construction work to be served by this utility work was exempt from Davis-Bacon prevailing wage recipients. That's not what the sub-recipient agreement says. The sub-recipient agreement says in page 14, number 6, paragraph 6, Davis-Bacon, contract for the installation of electric and water services must be signed and accomplished by the City of Springfield Office of Public Utilities, City, Water, Light, and Power. The project is exempt from Davis-Bacon reporting requirements. Now, what does the project mean here, the term project? Well, Newman-Alton would have you believe that that just meant the exemption for the municipal workers. It doesn't mean the entire, and I saw this overarching gesticulation with regard to, doesn't cover the entire construction project. But that's not what this document says. In paragraph 4 of that same page, it provides that as part of the conditions of this grant, at least 20% of the 8 units, 2 will initially be occupied by low-moderate income household at affordable rents. This grant represents less than 20% of the total project cost. So obviously the word project here means the entire project. And so the project is exempt from Davis-Bacon reporting requirements, meaning if you're going to use CDBG funds pursuant to the sub-recipient agreement, you're going to use municipal employees, and municipal employees are exempt from Davis-Bacon. It does not somehow metamorphose the entire construction project to a Davis-Bacon act. Indeed, I heard the notion about public policy being discussed here. The fact of the matter is that I'm quite certain that labor unions throughout this country would be delighted if utility work performed by a force account would... By what? By a force account, by the notion of a governmental unit being paid to do the infrastructure work. If that would turn the entire construction project into a Davis-Bacon, most trade unions would be delighted, because the usual scenario here is that the wages that are being paid on a construction site are less than Davis-Bacon when there's no public monies being used. And then when a municipality comes in and does the infrastructure work pursuant to a grant, it's been argued before by union trade unions that, gee, that should convert the entire project into a Davis-Bacon. That's not the case. What HUD has been saying throughout, and that's what's consistent with Ms. Volkman's letter, is that that doesn't convert the construction project to a Davis-Bacon. It's an exempt force account. In this instance, however, we have a higher level of state funding as well as the CDBG grant. And that state funding was IHDA money. And under those circumstances, if the state monies were being used for that, and the CDBG fund work specifically on city easements done by municipal workers doesn't convert the project into a Davis-Bacon, and necessarily it's a state prevailing wage project. But what's really peculiar about this is that Newton-Alton indicates that Davis-Bacon does apply. They first said, well, the reporting requirement. That just meant reporting to the trial court. That just meant the reporting requirements. It didn't mean the prevailing wage didn't apply. And then the answer is, well, where's the evidence that you reported this pursuant to Davis-Bacon? And then the next biggest question is, if you're arguing, your defense is… Did you raise that at the trial level? Pardon me? Did you raise that at the trial level? Yes. What was their response to, where's the evidence about the Davis-Bacon report? I raised it in my post-trial brief. I said, if it's reporting requirements, why did the municipal employees, if it's only reporting, why weren't the municipal employees paid Davis-Bacon wages? But they weren't. There was never an answer. The same thing goes with regard to the Davis-Bacon wages. If Davis-Bacon was the applicable law, why weren't they paid Davis-Bacon wages? Now, Neumann-Alton says in its brief that it denies that it didn't pay Davis-Bacon wages. But that's a matter of record here. The payroll records are before the court, before the trial court. They're in the records, all the certified payroll records of the court. And the Davis-Bacon rates are a matter of public record. It's irrefutable that the wages paid on the ILF project were not, craft employees were not paid, including Jeff Foggs, the fringe benefits that are required to be paid as part of the Davis-Bacon wages. Instead, fringe benefits were deducted from their base wage. And so the wages paid were approximately $9 to $10 less than the Davis-Bacon rates. And that's, as I say, irrefutable from the evidence that's in the record. Now, the question is, is if you're going to say that your defense is Davis-Bacon, isn't it curious that you didn't pay it? I submit to you that this is a situation where a contractor simply decided what they were going to pay, paid whatever they want. And when they were called upon to say, hey, isn't this a state prevailing wage, they dropped into the easiest trough to drop in because the Davis-Bacon wages are less than the state prevailing wage. And say, oh, no, this is a Davis-Bacon case. Well, it isn't. It's a state prevailing. And the question is, again, is that a delay? And the other question is, in terms of this honest dispute problem that we have in this case, is that, as the court can well see in the SLF project, there was a tender of what's called a tender of the amounts due on that project right before trial. But if there's really an honest dispute here and you discover that your Davis-Bacon argument falls flat because you didn't even pay Davis-Bacon, wouldn't you tender those if you were being an honest contractor? Instead of delaying this, and I guess my point is that a craft employee should not have to wait six to seven years to get their hourly wage. They should not have to go through protracted litigation. It's the responsibility of the contractor to get the determination. And what we have here is we actually have this letter from Ms. Volkman, and you can see the reaction of the principal officer. It was during discovery, no doubt about it. But his reaction was, well, that's her opinion. And the question is, well, did he make any inquiry about the appropriate wage? The answer was no, from anybody. And I submit that that's inappropriate. That's not what the contractor's responsibility is for. And I think that is the impetus for the court's ruling with regard to the judgment, the attorney's fees, the interest, and the statutory penalty. And I think that's well within the discretion of the court. Now, to switch over to the SLF project, I'm not sure why this is being brought up. As the court well knows and has set forth in the Statement of Facts, a tender is what was called a tender of all the amounts due except for the attorney's fees was provided unconditionally. And there was some sort of little gambit there to try to say, well, that moots all the issue. And I said, well, that doesn't moot the attorney's fees. Indeed, the settlement document or the settlement letter is part of the record. And it even stated in there, by the way, send us your itemized bills, redacted if you need to, for the attorney's fees. Because here's a check, unsolicited and unconditional. We're giving you a check for the wages in the SLF. We're giving you a check for the statutory penalty. We're giving you a check for prejudgment interest. And all that's left is the attorney's fees. Send us your redacted itemization. I did better than that. You did what? I did better than that. I put it in front of the court. I said, Judge Bells, tell us what you think is reasonable out of those fees on the SLF project. And the court did that. It pared it down, pared my attorney's fees down, because I'm probably more meticulous and jealous about the substance than my billing statements. But the court pared it down and said, this is what I think is reasonable. And instead of accepting that, New and Alton comes to go into the trial court and to this court and says, no attorney's fees are appropriate on the SLF. And I don't understand that from the standpoint of the tender that they made, why they would waste my time asking for an itemization of my bill if their position was going to be that no attorney's fees were appropriate. It just seemed like it was a reversal. And I don't know why that multifaceted took place, quite frankly. But in any event, why we're arguing about the notion of this tax credit versus non-tax credit, and I submit to you that what is being argued by New and Alton is that they're indicating that the only financing was tax credits. And I don't think the evidence shows that. I think a reasonable inference from Reverend Doss' statement that we received IHDA monies. And I asked him, is that state monies? You don't receive monies with a tax credit. And what I'm indicating is that if New and Alton was going to present some sort of affirmative defense that the only state money or state funding or state infusion was tax credits, that was their burden to prove. That was an affirmative defense to plead. They didn't do that. And I think there's a reasonable inference. I don't think it's the uncontradicted testimony that only tax credits were used on the SLF. But when it's all said and done, isn't it moot? Because New and Alton isn't asking for their tender back. They've already given it. They've already paid it. It's already been an offset. So why is that an issue before this court? Except for the notion of the attorney's fees, which has been before the trial court. The reasonableness has been determined. And a discretionary determination made how much to be paid. So I'm not sure why that issue has to be before this court. But I do think that, and if the court looks at the notion of the SLF Project II and that bidding notion, I also notice in the New and Alton reply brief, there was a statement that New and Alton's bid was accepted. Well, that's not what happened. That there was supposedly a sealed competitive bidding. There was a colloquy between an employee of New and Alton and the owner, and they bid it on the basis of Davis-Bacon, even though the contract project manual said it must be the higher bid at the higher Illinois provisional wage rates. None of the bids were accepted. They were too high. But because New and Alton bid Davis-Bacon wages, they were the low one. And so what happened is that they got together with the project manager and negotiated the contract in a non-competitive prologue to the bidding process. That's why the home funds were withdrawn from the city, because they were notified by yours truly that I thought that was anti-competitive and I thought that was inappropriate for a sealed competitive bidding. And lo and behold, after some time and forceful discussion, the city said we're not going to give these to federal home funds because it was anti-competitive. Now, New and Alton says, oh, we weren't part of that. That's the project team for the owner. They were the ones that bid in that manner. They were the ones that bid without the use of an addendum from the architect that that's how it's supposed to go with a sealed competitive bidding when you're using public monies. There's almost this kind of arrogance that they were entitled somehow to be able to be first in line. And just because the owner decided that would be okay and they accepted the contract in that regard, then everything was peachy. But it isn't peachy. It was anti-competitive. It was unfair. And they should have not even gotten to any sort of part of the work. But they did. The fact of the matter is that the home funds were withdrawn and this project became only state-supported by public monies. And if that's the case, then the higher Illinois prevailing wage applied and should have been paid. And in my estimation, it was acknowledged by that by the so-called tender. I don't know why else they would pay that tender unless they were acknowledging their ostensible reason for doing it. It's because it was such a small amount. But I don't think the court had to accept that. The trial court could readily see that that was an acknowledgment that this wasn't going anywhere for them, and they made that unconditional payment because they knew they weren't going to prevail. And now when they didn't prevail, they're coming to this court despite the fact that they're not asking for that money back. I don't quite understand that. But I'm asking this court to reaffirm the decision of the trial court in all its respects. I think the court took its time looking at the facts of the law, and I believe the court made the right decision. Mr. O'Hara, before you conclude, I wanted to mention I wanted to give you an opportunity to present your full argument before I have these comments. And that is I want to mention you've been before this court on several occasions, and you demonstrate that you're an experienced, vigorous advocate. You certainly are an expert in this complicated, arcane area of the law. But I have a concern about your brief that I wanted to share with you just speaking personally, and that is to put it in context, this court, we each write over 100 decisions a year, and we're on panels double that number, so we have an awful lot of briefs to get. And the first two sentences of your brief read as follows. Newton Alton's appellate brief, like its attempt to shortchange his employee out of his appropriate rages, is slick, tone-deaf to reality, and should be unavailable. The appellate argument is the latest chapter in its quixotic, nonstop attempt to provide cover for its willful disregard of appropriate wages. I mention this only because it's not helpful. We get an awful lot of briefs. Perhaps the best way to put it is your briefs are generally excellent, not because of the additional rhetoric Mr. O'Hara had. It makes it, you don't want to, as a reader, you don't want to force me to have to gear myself up to slog through a brief before I get to the crux of what is it you're trying to educate me about, persuade me about. Just thought I'd mention that to you because you're here often, and as I say, I do it as constructive criticism because you generally do an excellent job. Justice Steinman, I fully appreciate that. I want you to know that this particular case, given the relative differences in power, has made me probably a little more adamant than you. Back in the day, I was a vigorous advocate myself, so I can understand how that can be, but I thought I'd share it with you because you do a very nice job, and I thought that I should share that with you. Thank you so much. Thank you. There are several points here which I think really were not really on the main issue of the evidence in front of the court, but let me address them very quickly. One, the issue on the subrecipient agreement and focusing on the definition of project, it's the law that applies, and it's the construction at the site of the work. Pausing here, and it's a point that Mr. O'Hara made and I wanted to get to. With regard to the testimony about Dobbs, and forgive me if I'm putting you out of shape, but my limited attention span counts, so I want to get to it. What about his point that if this testimony is unclear or is not accurate, given that that's what he said, why isn't the burden on you to explain, wait a minute, you really didn't get state funding, you're mistaken about it, and either present evidence to that effect or impeach his testimony and do something else, especially when it seems to me that funding questions is something which ought to be capable of being established. They put forth some affirmative testimony through Dobbs. Other than saying he's just not believable, he's confused, why shouldn't we or the trial court have expected to do more? I think the answer is this. Planoff had to show that the Illinois Prevailing Wage Act applied. They alleged that it applied in their complaint. It would be part of their burden of proof. Planoff put forth the evidence of what they believed showed the Illinois Prevailing Wage Act. They did it in series, as we indicated in our brief. They called Mr. Alton and said, you know, I think, but I really don't know what the actual source. Reverend Doss was asked, and he goes, Ida money, okay? He said what? He said, Ida money. I think his words were, I can't remember. Right, okay. Probably two words, you know, state funding, whatever it was. But then the Planoff put on Chet Schneider and said, is it your job to know what the funding is for the SLF project? He asked him what projects, and he goes, Wyoming or the SLF. Is that your job? Yeah. What was the funding? He said, low income tax credits. So he put the specifics on what Reverend Doss was characterizing in a general fashion. He said, this is specifically what it is. And I know it because I looked at the application. And then I had asked him, I had him reaffirm that. And then I said, was there any other monies? And he said, to the best of his knowledge, no. So what I'm suggesting in our brief argument is that was the evidence that Planoff put forward, and that evidence, we believe. What about Doss' testimony? I think Doss' testimony, I don't see how the court, the trial court would have had to arbitrarily ignore Mr. Schneider's testimony. He said that he looked at the application. That's the application for the funds that Reverend Doss is saying was itemized. When, in fact, when the testimony came out, we're saying it wasn't the kind of funds that trigger the state prevailing wage. So Doss was mistaken or confused. Yeah, possibly. A couple of quick things. Like I said, it's the law frame, not the word project. The SLF project, there's a judgment against us. There are responsible bidder ordinances out there that say if you violate the prevailing wage, it goes into a decision. There's a reason to go do this. And, yeah, there were attorney's fees, but their reasons are beyond that because there's a judgment. It was this issue about the bidding. If you look at it, ILF, we laid it out. And the fact, ILF was not a bid project. It was a negotiated project. SLF was a bid project. There's not a single shred of evidence in the record that our client did anything other than make an inquiry. Maybe they made a bad judgment. They were told there was going to be federal funds. They bidded this Davis-Bacon. Eventually there was an award. The contract says in there, Davis-Bacon. And, in fact, until the home funds were pulled, literally almost after the contract was complete, then all of a sudden it flipped. So there's no shenanigans of any way it should perform. Our reply brief points out that. The attorney's fees issue, I think we have a right to challenge any kind of award. When it's discretion, that's what we did. We made that argument in our initial response. When the initial petition was filed, Judge Bell said, I will take it at the end of the case effectively. There was one we thought was premature. We raised it again. And we think under the circumstances, I know that there's a standard review. I appreciate that. That under the circumstances, this is bad jurisprudence. There has to be some limit to discretion. Discretion isn't automatic. And at some point it converts to a presumption. We believe in a case like this, where there's a good faith basis for litigation, trial isn't necessary, to punish somebody. To pick and choose. Should I litigate my case and run the risk that if the judge rules against me, I'm going to have to pay a ton of attorney's fees? Is that where the discretion, is that where the basis for doing it? None of the factors that normally would come in, like relative merits of the party, something totally frivolous. There was a comment about six to seven years. If you look at the record, this case was about 32 or so months. If you parse that record, you'll see we engaged in no delay, no pretrial motion. If you look at the gaps between it, there's about six months of actual time between waiting time, between something happening and something happening and something happening. I don't believe there's anything in this record that would support that kind of thing. Thank you. We'll take this matter under advisement, standing recess until the readiness of the last case.